UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TIMBISHA SHOSHONE TRIBE, et al.,          :
                                          :
              Plaintiffs,                 :
                                          :
        v.                                : Civil Action No. 10-968 (GK)
                                          :
KENNETH SALAZAR,                          :
Secretary of Interior, et al.,            :
                                          :
              Defendants.                 :


<u>MEMORANDUM OPINION</u>

Plaintiffs, who are a federally recognized Indian Tribe, citizens or members of the Tribe, and members of its Tribal Council, bring this action against Kenneth Salazar in his official capacity as Secretary of the Department of the Interior; the Department of the Interior; Timothy Geithner in his official capacity as Secretary of the Department of the Treasury; and the Department of the Treasury. Plaintiffs seek declaratory and injunctive relief on the grounds that the Western Shoshone Claims Distribution Act, Pub. L. No. 108-27, 118 Stat. 805 (2004), orders an unconstitutional taking of tribal property and denies equal protection of the law under the Fifth Amendment of the Constitution. This matter is before the Court on Defendants' Motion to Dismiss [Dkt. No. 9]. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons set forth below, the Motion to Dismiss is **granted.**

## I.    BACKGROUND

### A.    Factual Background[1]

This case concerns the proper distribution of a fund set aside for the benefit of the nations and tribes constituting the Western Shoshone Identifiable Group, of which Plaintiff Timbisha Shoshone Tribe ("the Tribe") is a member. On August 15, 1977, the Indian Claims Commission ("ICC") determined that the United States should pay the Western Shoshone Identifiable Group $26,145,189.89 ("the Fund") in compensation for the taking of a large area of the Western Shoshone homeland in Nevada and California. See W. Shoshone Identifiable Group v. United States, 40 Ind. Cl. Comm. 318, 387 (1977) ("the ICC decision"). Pursuant to the ICC decision, the Fund was appropriated and put into trust at the Treasury Department. The Fund has remained in the custody of the Treasury Department, earning interest, ever since.

The delay in distributing this award results from the particular manner in which ICC judgment funds are parceled out. Under 25 U.S.C. § 1401 et seq., after money is appropriated to pay the judgment funds, the Secretary of the Interior must devise a plan for distributing the funds among the potential beneficiaries

---

[1]    For purposes of ruling on a motion to dismiss, the factual allegations of the complaint must be presumed to be true and liberally construed in favor of the plaintiff. Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc., 525 F.3d 8, 15 (D.C. Cir. 2008); Shear v. Nat'l Rifle Ass'n of Am., 606 F.2d 1251, 1253 (D.C. Cir. 1979). Therefore, the facts set forth herein are taken from the Complaint.

and submit that plan to Congress. The plan becomes effective unless Congress enacts a joint resolution disapproving of the plan within 60 days of its submission. Id. at § 1405(a). However,

> "[i]n cases where the Secretary has to submit a plan dividing judgment funds between two or more beneficiary entities, he shall obtain the consent of the tribal governments involved to the proposed division. If the Secretary cannot obtain such consent within one hundred and eighty days after appropriation of the funds for the award or within one hundred and eighty days of January 12, 1983, he shall submit proposed legislation to the Congress."

Id. at § 1402(d). In such cases, therefore, Congress must act to distribute the award.

After the money relevant to this case was appropriated, the Western Shoshone Tribes, including the Timbisha Shoshone, declined to seek distribution of the Fund and instead demanded partial return of the underlying land for which the Fund was intended to provide compensation.[2] Because the Secretary was unable to obtain the tribes' consent to distribute the monies, the Fund sat undisturbed, waiting for Congress to pass a distribution act.

In 2004, Congress resolved to distribute the Fund by passing the Western Shoshone Claims Distribution Act ("the Distribution Act"), Pub. L. No. 108-27, 118 Stat. 805 (2004). The Distribution

---

[2] The Government's Opposition to Plaintiffs' Preliminary Injunction Motion [Dkt. No. 24] explains that the relevant Tribal Councils "uniformly opposed any kind of distribution of the judgment funds, believing that the distribution of the Judgment Funds [sic] would preclude them from seeking a return of the aboriginal lands." Defs.' Opp'n to Pls.' PI Mot. 4.

Act directs the Secretary of the Interior to establish a roll consisting of individuals with at least one-quarter degree of Western Shoshone blood who are citizens of the United States and living on the date of enactment of the Distribution Act, but who are not eligible to receive a per capita payment from any other judgment fund based on an aboriginal land claim. The Secretary of the Interior is then to distribute the award directly to these individuals and not to any tribal entities.

Plaintiffs, individuals claiming to represent the Tribe, brought this action to challenge the Distribution Act. Plaintiffs' Complaint alleges that the Distribution Act violates the Takings Clause of the Fifth Amendment and denies equal protection of the law under the Fifth Amendment by seizing tribal property--the Fund--and distributing it to individuals rather than the Tribe.

### B.    Procedural Background

On June 10, 2010, Plaintiffs filed their Complaint [Dkt. No. 1]. On October 22, 2010, Defendants filed their Motion to Dismiss [Dkt. No. 9]. On November 22, 2010, the Court granted a Motion for Leave to File an Amicus Curiae Brief in Support of Defendants' Motion to Dismiss ("Amicus Curiae") [Dkt. No. 16] filed by George Gholson, who claims that he, and not the Plaintiffs, is a member of the legitimate Tribal Council of the Timbisha Shoshone Tribe. On December 17, 2010, Plaintiffs opposed Defendants' Motion to Dismiss

[Dkt. No. 18]. On January 7, 2011, Defendants filed a Reply [Dkt. No. 23].

On January 5, 2011, prior to the filing of Defendants' Reply, Plaintiffs filed a Motion for Preliminary Injunction [Dkt. No. 21], asking the Court to preliminarily enjoin the first phase of distributions of the Fund, which Defendants indicated would occur sometime in February. On January 20, 2011, the Court heard oral argument on both the Motion for Preliminary Injunction and the Motion to Dismiss. After hearing argument, and for the reasons stated on the record in open court, the Court denied Plaintiff's Motion for Preliminary Injunction [Dkt. No. 26].

## II.  STANDARD OF REVIEW

Defendants ask the Court to dismiss Plaintiffs' claims under Rules 12(b)(1) and 12(b)(6). Under Rule 12(b)(1), Plaintiffs bear the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction. See Shuler v. U.S., 531 F.3d 930, 932 (D.C. Cir. 2008). In reviewing a motion to dismiss for lack of subject matter jurisdiction, the Court must accept as true all of the factual allegations set forth in the Complaint; however, such allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." Wilbur v. CIA, 273 F. Supp. 2d 119, 122 (D.D.C. 2003)(citations and quotations omitted). The Court may rest its decision on its own resolution of disputed facts. Id.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[ ] [his or her] claims across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563. A complaint will not suffice, however, if it "tenders 'naked assertions' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1948 (2009) (citing Twombly, 550 U.S. at 557).

Under the Twombly standard, a "court deciding a motion to dismiss must not make any judgment about the probability of the plaintiffs' success . . . must assume all the allegations in the complaint are true (even if doubtful in fact) . . . [and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc., 525 F.3d 8, 17 (D.C. Cir. 2008) (internal quotation marks and citations omitted).

## III. ANALYSIS

Defendants make a number arguments in favor of dismissal. Under Rule 12(b)(1), Defendants contend that Plaintiffs cannot establish jurisdiction because (1) Defendants have not waived sovereign immunity and (2) Plaintiffs' takings claim must be

brought in the Court of Federal Claims. Additionally, the Amicus Curiae brief submitted by George Gholson and endorsed by the Defendants in their Reply and at oral argument submits that, due to political strife within the Timbisha Shoshone Tribe, Plaintiffs lack standing to bring a lawsuit on behalf of the Tribe. Under Rule 12(b)(6), Defendants argue (1) that Plaintiffs have failed to make allegations supporting a claim against the Treasury Department and Secretary of the Treasury, (2) that Plaintiffs cannot set forth a property interest sufficient for a takings claim, and (3) that Plaintiffs have failed to state a claim for denial of equal protection. Each argument will be considered in turn.

**A.    Plaintiffs Have Made Sufficient Allegations to Survive a Motion to Dismiss Under Rule 12(b)(1)**

**1.    Sovereign Immunity Does Not Bar Plaintiffs' Claims**

Defendants argue that Plaintiffs have failed to demonstrate that Defendants have waived their sovereign immunity. Defs.' Mot. 6. Defendants contend that 28 U.S.C. §§ 1331 and 1362, upon which Plaintiffs rely to invoke the jurisdiction of this Court, do not waive the United States' sovereign immunity. Id. at 5-6; see Compl. ¶ 2. Plaintiffs respond that sovereign immunity does not bar suits for specific relief against the government where the challenged official action is alleged to be unconstitutional, and that Section 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, has effected a waiver of sovereign immunity in cases alleging unconstitutional agency action. Pls.' Opp'n 2-5.

Although Defendants are of course correct that suits against the United States are barred absent a waiver of sovereign immunity, it is clear that sovereign immunity does not apply to a claim seeking specific relief "in which the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional." <u>Larson v. Domestic & Foreign Commerce Corp.</u>, 337 U.S. 682, 690 (1949); <u>see also</u> <u>Clark v. Library of Congress</u>, 750 F.2d 89, 102 (D.C. Cir. 1984) ("It is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority.").

Defendants attempt to limit <u>Larson</u> on the ground that "<u>Larson</u> and its prodigy [sic] concern ultra vires actions on the part of government officials." Defs.' Reply 3. Defendants plainly misread <u>Larson</u>. The Supreme Court specifically listed (1) cases involving <u>ultra</u> <u>vires</u> actions by a government officer as well as (2) cases alleging unconstitutional actions taken by a government officer as <u>separate</u> examples of cases in which no waiver of sovereign immunity is required. <u>Larson</u>, 337 U.S. at 689-90. The Supreme Court stated that "[t]hese two types have frequently been recognized by this Court as the only ones in which a restraint may be obtained against the conduct of Government officials." <u>Id.</u> at 690. Indeed, the Supreme Court noted that, in the case of action taken pursuant to

an unconstitutional statute, "the conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign. The only difference [from an ultra vires claim] is that in this case the power has been conferred in form but the grant is lacking in substance because of its constitutional invalidity." Id.

In addition, our Court of Appeals has consistently ruled that in cases seeking specific, non-monetary relief the "APA's waiver of sovereign immunity applies to any suit whether under the APA or not." Trudeau v. FTC, 456 F.3d 178, 186 (permitting suit against the FTC under 28 U.S.C. § 1331) (D.C. Cir. 2006) (quoting Chamber of Commerce v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996)) (internal quotations omitted); Clark, 750 F.2d at 102 ("[T]he 1976 amendments to § 702 . . . eliminated the sovereign immunity defense in virtually all actions for non-monetary relief against a U.S. agency or officer acting in an official capacity.").

Although Plaintiffs do rely on 28 U.S.C. §§ 1331 and 1362 to invoke this Court's jurisdiction, rather than Section 702 of the APA, Plaintiffs also clearly allege that the actions to be taken by the Defendants under the Distribution Act will constitute agency action pursuant to an unconstitutional statute. See Compl. ¶¶ 43, 50.

In sum, Plaintiffs' suit is not barred by sovereign immunity under Larson, 337 U.S. at 690, and sovereign immunity has been specifically waived in Section 702 of the APA.

### 2. This Court Has Jurisdiction over the Takings Claim

Defendants next argue that this Court does not have jurisdiction over Plaintiffs' takings claim. Defs.' Mot. 8. Defendants rely on the Tucker Act, 28 U.S.C. § 1491(a), which vests jurisdiction in the United States Court of Federal Claims over suits seeking monetary compensation from the United States under the Constitution, including takings claims under the Fifth Amendment. See Ry. Labor Execs.' Ass'n v. United States, 987 F.2d 806, 815-16 (D.C. Cir. 1993) ("the Federal Claims Court's jurisdiction in such cases is exclusive.").

Nonetheless, as the Plaintiffs have pointed out, the Supreme Court has held that "'the presumption of the Tucker Act availability must be reversed where the challenged statute, rather than burdening real or physical property, requires a direct transfer of funds' mandated by the Government." Eastern Enterprises v. Apfel, 524 U.S. 498, 521 (1998)(quoting In re Chateaugay Corp., 53 F.3d 478, 493 (2d Cir. 1995)). The Supreme Court explained that requiring Plaintiffs seeking equitable relief--i.e., as in this, case a declaratory judgment and permanent injunction--barring the government from distributing funds to wait until that money is actually disbursed in order to pursue Tucker Act remedies for

compensation "'would entail an utterly pointless set of activities.'" Eastern Enterprises, 524 U.S. at 521 (quoting Student Loan Mktg. Ass'n v. Riley, 104 F.2d 397, 401 (D.C. Cir. 1997). Consequently, the Supreme Court ruled that "it is within the district courts' power to award such equitable relief." Id. at 522. Hence, Plaintiffs' claim seeking to enjoin distribution of the Fund may be brought in this Court rather than the Court of Federal Claims.

### 3. Plaintiffs Have Made Sufficient Allegations Regarding Standing to Survive a Motion to Dismiss Under Rule 12(b)(1)

Finally, Defendants submit that these Plaintiffs do not, in fact, represent the Timbisha Shoshone Tribe and therefore have no standing to advance a claim on behalf of the Tribe. This argument was first presented by George Gholson in his amicus curiae brief. According to Mr. Gholson, the Timbisha Shoshone Tribe is currently embroiled in an internal political dispute, with two factions each claiming to be the legitimate Tribal Council of the Timbisha Shoshone. As a result, the Bureau of Indian Affairs currently recognizes no Tribal Council for the Timbisha Shoshone. Amicus Curiae 1-2.

Defendants argue that Plaintiffs have not sufficiently demonstrated that they represent the Tribe in an official capacity. Therefore, Defendants argue, Plaintiffs' case must be dismissed

because they have no standing as individuals to assert an injury suffered by the Tribe.[3]

The "irreducible constitutional minimum" of standing requires plaintiffs to demonstrate (1) that they have suffered an "injury in fact," (2) that there is "a causal connection between the injury and the conduct complained of," and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotations omitted); Shays et al. v. F.E.C., 414 F.3d 76, 83 (D.C. Cir. 2005). In addition to the constitutional requirements for standing, plaintiffs must satisfy the prudential limitations, including assertion of their "own legal rights and interests, and cannot rest [their] claim to relief on the legal rights or interests of third parties." Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 474 (1982) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)) (internal quotations omitted).

Defendants argue that because the BIA does not recognize them as representatives of the Tribe, Plaintiffs are merely individuals attempting to vindicate tribal rights. Defs.' Opp'n to Pls.' PI Mot. 9. Defendants claim that, without BIA recognition, "Plaintiffs

---

[3]     Plaintiffs have conceded that "[a]ll of the individual Plaintiffs sue only on behalf of the Tribe, not on their own behalf as individual members of the Tribe." Pls.' Reply in Support of Mot. for PI 7 [Dkt. No. 25].

cannot bring claims on behalf of the Timbisha" because "tribal members lack standing to protect a tribe's rights." Id. At least one court has agreed with the government and held that individual members have no standing to claim an injury on behalf of the tribe. See Hackford v. Babbitt, 14 F.3d 1457, 1466 (10th Cir. 1994) (holding that prudential limitations bar a plaintiff from claiming an injury to an indivisible tribal asset); see also James v. Watt, 716 F.2d 71, 72 (1st Cir. 1983) (noting that individual Indians have no cause of action under the Indian Nonintercourse Act because the Nonintercourse Act was designed to protect the land rights only of tribes).

However, Defendants fail to provide legal support for their theory that standing to represent tribal interests is premised on BIA recognition. Importantly, Defendants misread Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 58 (2d Cir. 1994) ("Golden Hill Tribe"), the principal case on which they rely in their Opposition to Plaintiffs' Motion for Preliminary Injunction. See Defs.' Opp'n to Pls.' PI Mot. 9.

Critically, the Second Circuit held that the plaintiff successfully pled standing as an Indian tribe despite lack of recognition by the BIA. Golden Hill Tribe, 39 F.3d at 58. The court relied on the plaintiff's allegations that it represented an Indian tribe, and not on the absence of a BIA determination, in assessing standing at the motion to dismiss stage. Id. at 58-59. Thus, Golden

<u>Hill Tribe</u> supports Plaintiffs', rather than Defendants', position, since the Second Circuit permitted a plaintiff lacking any BIA recognition of tribal status to satisfy the requirements of standing simply "by declaring that it is an Indian tribe." <u>Id.</u> at 58.

Defendants' conclusion that <u>Golden Hill Tribe</u> held that plaintiffs could not establish standing because "members could not assert [the] tribe's claim to land" is simply wrong. Defs.' Opp'n to Pls.' PI Mot. 10. Although the Second Circuit remanded the case with instructions to stay the proceedings "pending the BIA's consideration of Golden Hill's claim for tribal recognition," those instructions did not relate to the standing inquiry. <u>Golden Hill Tribe</u>, 39 F.3d at 61. Rather, the Second Circuit ordered the stay under the doctrine of primary jurisdiction. <u>Id.</u> at 58. Unlike this case, <u>Golden Hill Tribe</u> involved a claim under the Nonintercourse Act,[4] which requires plaintiffs to prove tribal status. <u>See</u> <u>id.</u> at 59. The Second Circuit held that "the BIA is better qualified by virtue of its knowledge and experience to determine at the outset whether Golden Hill meets the criteria for tribal status." <u>Id.</u> at 60. In other words, the Second Circuit deferred to the judgment of

_____

[4] The Nonintercourse Act provides, "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177 (1988).

the BIA for determining tribal status under the Nonintercourse Act--an issue irrelevant to standing. See id. at 58-61.

As the Supreme Court has held, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." Lujan, 504 U.S. at 561 (internal quotations omitted). Here, Plaintiffs have alleged that they are members of the governing Tribal Council of the Timbisha Shoshone. Compl. ¶¶ 4-10. The Court must accept that allegation as true for purposes of a Motion to Dismiss. Such allegations are sufficient to survive a motion to dismiss for lack of standing under Rule 12(b)(1).

**B.    Plaintiffs Have Failed to State a Claim for Relief Under Rule 12(b)(6)**

**1.    Plaintiffs Have Failed to State a Claim Against the Department of Treasury and the Secretary of the Treasury**

As a preliminary matter, Defendants argue that Plaintiffs' "allegations are insufficient to find that Plaintiffs have stated a viable claim against the Treasury Department and the Secretary of Treasury." Defs.' Mot. 7. Defendants observe that "Plaintiffs fail to identify any action that the Treasury Department or the Secretary of the Treasury have taken or will take under the Distribution Act." Id. Plaintiffs protest that injunctive relief must be granted against the Treasury Department and Secretary of

the Treasury because "[i]t can be inferred that, even though the Distribution Act refers to distribution of the funds by the Secretary of Interior, the Secretary of the Treasury and Department of the Treasury will play a necessary role in the administration of the distribution, because they have actual custody of the funds." Pls.' Opp'n 37-38.

As Defendants note, the sole allegation made specifically against Secretary Geithner is that he is sued in his official capacity as Secretary of the Treasury. Compl. ¶ 13. The sole allegation made specifically against the Treasury Department is that it "is named as a Defendant, because the fund of money is now held in an account in the United States Treasury." Id. at ¶ 14.

The Distribution Act mandates that the Secretary of the Interior "shall make a per capita distribution of 100 percent of the Western Shoshone judgment funds," and, significantly, makes no mention of the Treasury Department or Secretary. 118 Stat. 805, § 3(4)(c)(1). Even with "the benefit of all reasonable inferences derived from the facts alleged," there is no allegation that the Treasury Department or the Secretary of the Treasury is required or authorized to take any action under the Distribution Act.[5]

---

[5] As noted above, the Distribution Act only calls for the Secretary of the Interior to distribute the Fund. Therefore, to the extent Treasury would take any action relating to the Fund, it would be at the direction of the Secretary of the Interior. In practical terms, then, an injunction against the Secretary of the Interior would suffice to remedy Plaintiffs' alleged harm.

Aktieselskabet AF 21. November 2001, 525 F.3d at 17. Therefore, Plaintiffs have failed to allege a claim upon which relief can be granted against the Treasury Department or the Secretary of the Treasury.

### 2. Plaintiffs Have Failed to State a Claim Under the Takings Clause

The core of Plaintiffs' takings claim is that the Fund is the property of the tribes that make up that Western Shoshone Identifiable Group and not of individual Western Shoshone Indians. Plaintiffs argue that the ICC provided relief for the taking of the Tribe's communal property. Therefore, according to the Plaintiffs, distributing the Fund to individual Western Shoshones would be an unconstitutional taking of tribal property under the Fifth Amendment. Pls.' Opp'n 15-18. Defendants argue that no property right in ICC awards vests in any entity or individual until the award is actually distributed. Defs.' Mot. 11-12.

In order to make out a claim under the Takings Clause of the Fifth Amendment, Plaintiffs must "show that the government, by some specific action, took a private property interest for a public use without just compensation." Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004) (citing Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 294 (1981)). Therefore, Plaintiffs must allege a "cognizable property interest" to state a claim. Adams, 391 F.3d at 1218.

Plaintiffs contend that the Tribe obtained an ownership interest in the Fund as soon as the money was deposited in the Fund account pursuant to the ICC decision. Pls.' Opp'n 18-19. Plaintiffs rely on United States v. Dann, which held that "payment" extinguishing aboriginal title to the land at issue in the ICC decision occurred at the time the money was deposited into the Fund account. 470 U.S. 48, 50 (1985) ("Once the money was deposited into the trust account, payment was effected.").[6]

Nonetheless, there is a great deal of authority indicating that no individual or entity possesses a property interest in an ICC judgment fund until that fund has actually been distributed. In particular, Defendants rely on LeBeau v. United States, 474 F.3d 1334 (Fed. Cir. 2007), decided long after Dann. LeBeau considered a claim for money damages by certain lineal descendants of a tribe because of the Government's failure to timely distribute judgment funds. Id. at 1336. The Federal Circuit explained that "[i]f the descendants' rights in the Judgment Fund had vested (that is, the lineal descendants had already received their distribution), Congress could not have deprived them of their share of the

_____

[6] Plaintiffs also cite to a decision of the Court of Federal Claims finding that, in a suit claiming a breach of fiduciary duty by the Government regarding this particular Fund, "the 2004 Distribution Act has no effect whatsoever on the beneficial interests of the Tribal Plaintiffs in the Western Shoshone tribal trust funds held by the Government." Western Shoshone Identifiable Group v. United States, No. 1:06-cv-00896-EJD (Fed. Cl. Nov. 24, 2009). The Court did not find this ruling helpful.

Judgment Fund without damages consequences under either a breach-of-trust claim or a takings claim." Id. at 1342 (emphasis added). The court went on to say that the "lineal descendants' right to their per capita share of the Judgment Fund was always subject to modification by Congress until distribution of their share occurred, which would vest the lineal descendants' rights in the Judgment Fund." Id. at 1343. Therefore, the court reasoned, Congress was free to reallocate the share of the judgment fund at issue in that case at any time prior to distribution "because the lineal descendants never acquired vested rights in their share of the Judgment Fund." Id. In short, the Federal Circuit, whose rulings bind this Court, held that no one can claim a vested property interest in an ICC judgment fund until distribution of the award.[7]

This result is in accord with the significant body of law concerning Congress's plenary power over Indian property and especially the distribution of ICC judgment funds. The Supreme Court has emphasized Congress's "traditional broad authority over the management and distribution of lands and property held by recognized tribes, an authority drawn both explicitly and implicitly from the Constitution itself" and has noted that "[t]his authority of Congress to control tribal assets has been termed 'one

---

[7] Interestingly, the LeBeau opinion makes no mention of Dann.

of the most fundamental expressions, if not the major expression, of the constitutional power of Congress over Indian affairs.'" Del. Tribal Bus. Comm. v. Weeks, 430 U.S. 73, 85-86 (1977) (quoting F. Cohen, Handbook of Federal Indian Law 94, 97 (1942)).

In light of these pronouncements, the Supreme Court has held that the appropriate standard of judicial review for acts distributing tribal funds "ordinarily requires the judiciary to defer to congressional determination of what is the best or most efficient use for which tribal funds should be employed" and a legislative judgment "should not be disturbed as long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians." Id. at 85 (internal quotations omitted). Elsewhere, the Supreme Court has "recognized the wideranging congressional power to alter allotment plans until those plans are executed." Northern Cheyenne Tribe v. Hollowbreast, 425 U.S. 657, 656-67 (1976).

The structure of 25 U.S.C. § 1401 et seq. further demonstrates that Congress did not create a property interest in ICC awards until distribution. See Adams, 391 F.3d at 1219 ("'existing rules or understandings that stem from an independent source,' such as state, federal, or common law, create and define the dimensions of property interests for purposes of establishing a cognizable right and hence a potential taking.") (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1030 (1992)). As discussed above, 25 U.S.C.

§§ 1402 & 1405 give Congress--and not the ICC--final say over the proper distribution of any award (and, it should be noted, have in this case resulted in a delay of over thirty years between the award of the judgment fund and its distribution pursuant to congressional act). As the Court of Claims has noted, determining the identity of the recipient of an ICC award was reserved to the competence of the legislative and executive branches and not given to the ICC or the courts. <u>Cherokee Freedmen and Cherokee Freedmen's Assoc. v. United States</u>, 195 Ct. Cl. 39, 1971 WL 17825, at *5-7 (Ct. Cl. 1971).

Finally, although <u>Dann</u> does contain language favorable to the Plaintiffs, the decision does not speak directly to the issue presented here. Plaintiffs quote <u>Dann</u> as stating, "the Indian Claim Commission ordered the Government <u>qua</u> judgment debtor to pay $26 million to the Government <u>qua</u> trustee for the Tribe as the beneficiary." <u>Dann</u>, 470 U.S. at 50; Pls.' Opp'n 18. Plaintiffs argue that this statement leads to the conclusion that "payment of the judgment fund to the tribes, and not to individual lineal descendants of the Western Shoshone Identifiable Group, shows beyond doubt that the tribes own the judgment fund and that the government holds the funds in trust for the tribes." Pls.' Opp'n 18.

Plaintiffs read <u>Dann</u>'s language too broadly. <u>Dann</u> did not conclude that Congress made actual distribution to the Tribe, or that the Tribe had a vested property interest in the Fund. Rather, <u>Dann</u> held only that aboriginal title to the land was extinguished when the money was appropriated and placed in an account at the Department of Treasury. <u>Dann</u>, 470 U.S. at 41, 44-45 ("The question presented in this case is whether the appropriation of funds into a Treasury account . . . constitutes 'payment' under § 22(a) of the Indian Claims Commission Act.").

As the court in <u>Dann</u> observed, "the Government was at once a judgment debtor, owing $26 million to the Tribe, and a trustee for the Tribe responsible for ensuring that the money was put to productive use and ultimately distributed in a manner consistent with the best interests of the Tribe." 470 U.S. at 49-50. Hence, the Government may have made "payment" sufficient to extinguish the tribe's aboriginal rights to the land in question, but it does not necessarily follow that any particular entity or member of the tribes at that point obtained a property interest in the Fund. Rather, in its role as trustee, Congress retained authority to distribute the Fund "in a manner consistent with the best interests of the Tribe." <u>Id.</u>

Because the Timbisha Shoshone Tribe does not have a property interest in the Fund under the Fifth Amendment, Plaintiffs have failed to state a claim for which relief can be granted under the Takings Clause.

### 3. Plaintiffs Have Failed to State a Claim for Denial of Equal Protection

Plaintiffs' second cause of action alleges that the Defendants "deprive the Plaintiffs of due process of law and the equal protection of the law in violation of the equal protection guarantee of the Fifth Amendment to the Constitution" because the actions to be undertaken by the Defendants pursuant to the Distribution Act "are invidious, harmful, and detrimental to Plaintiffs and are based on the Indian race or ancestry of Plaintiffs." Compl. ¶¶ 48-50. Plaintiffs argue that the "challenged Act specifies a group for particular treatment, for the taking of their money, in a way that is racial or ancestral." Pls.' Opp'n 31.

Plaintiffs make the novel argument that the Distribution Act violates the Equal Protection Clause because it defines the Fund as those "funds appropriated in satisfaction of the judgment awards granted to the <u>Western Shoshone Indians</u>." 118 Stat. 805, § 2(2)(A) (emphasis added). Plaintiffs argue that this definition, along with the inclusion of "the Western Shoshone identifiable group" in the title of the Act, demonstrates that the Act unconstitutionally targets the "Western Shoshone Identifiable Group." Pls.' Opp'n 31. Defendants argue that Plaintiffs' claim must be dismissed because

"rational basis review applies in this case–and the Distribution Act is undoubtedly rationally related to a legitimate government interest." Defs.' Mot. 13.

   a.   **The Distribution Act Is Subject to Rational Basis Review**

As a threshold matter, parties disagree on what degree of review should be applied under Plaintiffs' equal protection claim. Plaintiffs contend that "a classification that explicitly describes the people or groups on which a particular harm is imposed simply as an 'Indian tribe' or 'Indians,' or of 'Indian descent' is indeed an ancestral or racial classification . . . [and] calls for strict scrutiny." Pls.' Opp'n 32.

However, it is abundantly clear that the "standard of review for judging the constitutionality of Indian legislation under the Due Process Clause of the Fifth Amendment . . . focuses on whether the statute's objectives are tied rationally to the fulfillment of Congress' unique obligation toward the Indians." Littlewolf v. Lujan, 877 F.2d 1058, 1064 (D.C. Cir. 1989) (quoting Weeks, 430 U.S. at 84 (1977)) (internal quotations omitted). In Morton v. Mancari, which Plaintiffs agree is the leading case on equal protection in this context, the Supreme Court upheld a statute mandating preference for Indians in BIA hiring because "the preference is reasonably and directly related to a legitimate, nonracially based goal." 417 U.S. 535, 554 (1974). The Court emphasized that the "plenary power of Congress to deal with the

-24-

special problems of Indians is drawn both explicitly and implicitly from the Constitution itself." Id. at 551. Therefore, federal legislation--as opposed to state or local--must receive rational basis review. See id.; Littlewolf, 877 F.2d at 1064.

The cases Plaintiffs do cite for the proposition that government actions classifying American Indians as an ancestry or race should be reviewed under strict scrutiny are unavailing. None of those cases challenged the validity of the classifications Congress enacted in federal legislation, and therefore Morton was not controlling. See Tuttle v. Kaiser Co., 863 F.2d 601, 601 (8th Cir. 1988) (claiming discrimination by a private employer under Title VII of the Civil Rights Act); Morrison v. Garraghty, 239 F.3d 648, 652 (4th Cir. 2001) (challenging a policy of the Virginia Department of Corrections under 42 U.S.C. § 1983); Fallon Paiute-Shoshone Tribe v. City of Fallon, 174 F. Supp. 2d 1088, 1090 (D. Nev. 2001) (claiming a violation of equal protection against a city under 42 U.S.C. § 1983). Therefore, the particularly deferential review accorded to federal legislation regarding American Indians naturally did not apply.

Finally, Plaintiffs attempt to distinguish Morton on the ground that, in Morton, "the individuals subject to preference were significantly defined in the statute in political terms: membership in a tribe that, in turn, has a recognized political relationship with the United States." Pls.' Opp'n 34. Plaintiffs argue that "the

kind of classification in this [Distribution] Act is, in fact and in history, simply an ancestral or racial classification." Id. at 34. This argument is particularly unconvincing in light of the actual statutory language challenged by the Plaintiffs.

The principal language in the Distribution Act challenged by the Plaintiffs defines the term "Western Shoshone joint judgment funds" as "the funds appropriated in satisfaction of the judgment awards granted to the Western Shoshone Indians in Docket Numbers 326-A-1 and 326-A-3 before the United States Court of Claims." 118 Stat. 805, § 2(2)(A). Plaintiffs believe that this language indicates a racial classification of "Western Shoshone Indians." Pls.' Opp'n 31. However, this language plainly does not target the Western Shoshone Indians "for particular treatment, for the taking of their money, in a way that is racial or ancestral." Id. This language merely identifies the particular fund of money subject to provisions of the Distribution Act. In this sense, the Distribution Act classifies the persons affected not by race or ancestry, but rather in terms of their relationship to the ICC decision.

Therefore, in considering Plaintiffs' equal protection claim, the Court must determine only whether the Distribution Act "is reasonably and directly related to a legitimate, nonracially based goal." Morton, 417 U.S. at 554; Littlewolf, 877 F.2d at 1064.

### b. The Distribution Act Has a Rational Basis

Under rational basis review, "legislation is presumed valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." <u>City of Cleburne, Tex. v. Cleburne Living Center</u>, 473 U.S. 432, 440 (1985). Further, the judiciary must "defer to congressional determination of what is the best or most efficient use for which tribal funds should be employed." <u>Weeks</u>, 420 U.S. at 84.

Here, Defendants clearly cite to four legitimate government purposes: (1) "avoiding delay," (2) "providing payment on a historic claim," (3) "acting in furtherance of the United States' trust relationship," and (4) "complying with the wishes of the vast majority of the tribal members who overwhelmingly desire to receive the judgment awarded to them more than twenty years ago." Defs.' Mot. 15. Defendants contend that Congress addressed the reasons behind its policy choices during the legislative process. For example, during debate on the Senate floor, Senator Harry Reid, the bill's sponsor, noted that the "final distribution of this fund has lingered for more than twenty years, and the best interests of the Tribe will not be served by a further delay in enacting this legislation." 147 Cong. Rec. S5618-01 (2001). Senator Reid went on to say that the bill would "provide payments to eligible Western Shoshone tribal members" and that "[t]he Western Shoshone Steering Committee, a coalition of Western Shoshone individual tribal

members, has officially requested that Congress enact legislation to affect this distribution." _Id._; Defs.' Mot. 18. Finally, Defendants submit that "Congress' prior experience with per capita distributions of awards pursuant to ICC judgments has proven this to be a workable solution that has the potential to settle a claim which has been unresolved for a great length of time." _Id._ at 19.

Plaintiffs argue, _inter alia_, that "Defendants did not explain how or why avoiding delay . . . is a sensible or legitimate rationale for taking a money fund belonging to the Plaintiff Tribe and giving it to others" and that "providing payment on a claim . . . is appropriate but does not explain or justify paying to others money that the Claims Commission awarded to the tribes." Pls.' Opp'n 36. Whatever the merits of Plaintiffs' policy arguments in favor of a different distribution formula, they do not invalidate the rationality or reasonableness of Congress's actions. _See, e.g.,_ _Heller v. Doe_, 509 U.S. 312, 319 (1993) ("rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.") (internal quotations omitted); _City of New Orleans v. Dukes_, 427 U.S. 297, 303 (1976) ("the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines."); _Hedgepeth v. Washington Metro._

<u>Area Transit Auth.</u>, 386 F.3d 1148, 1157 (D.C. Cir. 2004) ("it is not our place to second-guess such legislative judgments.").

Although the Court is certainly mindful of the long history regarding distribution of the Fund, as well as the impoverished condition of the Tribe, as recounted in Plaintiffs' briefing and at oral argument, the Court must defer to Congress's rational judgment regarding the appropriate apportionment of the Fund. <u>Weeks</u>, 420 U.S. at 84. The proper distribution of an ICC award among many competing interests and desires, be they individual or tribal, is a judgment that is given to Congress's discretion. <u>See</u> <u>Cherokee Freedmen</u>, 195 Ct. Cl. 39, 1971 WL 17825, at *5-7. Therefore, Plaintiffs have failed to state a claim for which relief can be granted for denial of equal protection of the law.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' Motion to Dismiss is **granted.**

An Order will issue with this opinion.


March 1, 2011
                                    ___/s/_____
                                    Gladys Kessler
                                    United States District Judge


**Copies to:** counsel of record via ECF